FREDERICK L. HOUGHTON ET AL. *v.* JESSE R. GRIMES ET AL.

May Term, 1932.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and GRAHAM, JJ.

Opinion filed February 7, 1933.

232

*Wm. R. Daley, Carpenter & Clawson,* and *A. F. Schwenk,* for the plaintiff.

*Herbert G. Barber* and *A. V. D. Piper* for the defendant Jesse R. Grimes.

THOMPSON, J. On October 13, 1920, Jesse R. Grimes, the only defendant remaining in this case, and hereafter called the defendant, brought a suit against the Central New Hampshire Power Company of Maine, a corporation organized under the laws of Maine, and hereafter called the Maine Company, return-

able in the county court of Windham. At the same time he obtained an injunction in a suit in equity, by which the Maine Company was enjoined from selling, transferring, or disposing of 6,690 shares of the common stock of the Central Light & Power Company, a corporation organized under the laws of Massachusetts, and hereafter called the Massachusetts Company, the certificate of which had not been, and was not then, within this State.

On December 23, 1921, before anything further had been done in either of these proceedings, the plaintiffs in the instant case, all of them members of an unincorporated association hereafter called the Houghton Associates, of which the defendant, Frederick L. Houghton and John Manley were members, brought this suit in equity and obtained an injunction against the defendant, restraining him from proceeding with his action at law against the Maine Company. Later, the injunction was enlarged to include two other suits brought on the same identical cause of action by the defendant against the Maine Company, one, an action at law in New Hampshire, and the other, a suit in equity in Massachusetts.

There was a hearing in the plaintiff's suit, and, on June 5, 1925, a decree was entered dissolving the injunction and dismissing the bill. The decree was subsequently affirmed by this Court (100 Vt. 99, 135 Atl. 15).

At the April Term, 1927, of the Windham county court, the defendant recovered judgment for $22,667.60 damages, and his costs, in his action at law against the Maine Company. An execution was issued and returned *nulla bona;* and thereafter application was made for an assessment of the damages caused by the injunction. There was a hearing before the chancellor who found that the defendant had been damaged by the injunction to the amount of his judgment, and there was a decree for him to recover damages for that amount. The plaintiffs appealed; and, after hearing in this Court, the decree was reversed as to this defendant, and remanded for a new trial upon the issue of damages sustained by him by reason of the injunction (103 Vt. 54, 151 Atl. 642).

That issue has been tried again before the same chancellor, and, on a finding that the damages of the defendant by reason of the injunction are $18,500, a decree was entered for the defendant to recover such damages and interest thereon, amounting

in all to $23,808.92, and his costs. The case is before us on the appeal by the plaintiffs from this decree.

When the case was first before this Court on the assessment of injunction damages, it appeared from the findings that when the plaintiffs obtained their injunction against the defendant the value of the 6,690 shares of the common stock of the Massachusetts Company, owned by the Maine Company, was more than sufficient to cover the amount of the judgment finally obtained by the defendant; and, if he had not been enjoined, he could have satisfied his judgment by proper proceedings against the stock certificate wherever found.

The case was reversed on the ground that the burden was on the defendant to establish his damages by proper evidence; that, in order to make such damages appear, he would have to prove that his judgment, which would have been collectible in whole or in part if the injunction had not been issued, had become collectible in a less degree or wholly uncollectible by reason of the restraint imposed upon him, because, if the judgment were still collectible in part after the dissolution of the injunction, it would be his duty to make reasonable use of the means at hand to protect himself against loss; that he had not sustained that burden of proof, as no evidence was introduced tending to show an absence of value in the 6,690 shares of stock or a diminution in the value of the stock from what it was when the injunction was issued.

It appears that on October 25, 1922, the defendant brought an action at law in New Hampshire against the Maine Company on the identical cause of action on which his suit in Windham county court was brought, and attached a large quantity of real estate in New Hampshire of which the Maine Company was the holder of the record title, but was not in fact the owner, as it had previously sold and transferred the same to the Massachusetts Company, of which fact the defendant had notice. This suit was still pending in court on January 2, 1931.

It also appears that on October 31, 1922, the defendant brought a suit in equity in Massachusetts against the Maine Company and the Massachusetts Company in which it prayed for a judgment against the Maine Company and for an injunction to restrain the Massachusetts Company, its officers, etc., from transferring on its books any of the stock owned by the Maine Company, and that such stock might be ordered sold and

the proceeds applied in payment of defendant's judgment. It did not appear what disposition, if any, was made of this suit.

██ ██ It was not error for the chancellor to refuse to comply with plaintiff's requests that "It did not appear in evidence but that the defendant might have been able to have secured a part or all of his judgment in said chancery action in Massachusetts"; and that "It did not appear in evidence but that the defendant might have been able to have collected a part or all of his said judgment in said action," in New Hampshire.

The judgment of this Court affirming the decree dissolving the temporary injunction was rendered November 4, 1926, 100 Vt. 99, 135 Atl. 15. It is conceded by the parties that the 6,690 shares of stock "were of no value at any time after the injunction was dissolved." It appears clearly from this concession that the defendant could not have secured any part of his judgment in the Massachusetts suit. Furthermore, the judgment rendered for the defendant in Windham county court operated as a merger of the cause of action, and was a bar to the further prosecution of the suits in New Hampshire and Massachusetts, they being between the same parties and upon the same claim. *McGilvray* v. *Avery*, 30 Vt. 538; *Hall* v. *Winchell*, 38 Vt. 588, 592; *Low* v. *Mussey*, 41 Vt. 393; *Green* v. *Starr*, 52 Vt. 426.

██ It appears that on October 7, 1926, which was before the injunction was dissolved, the superior court, Sullivan County State of New Hampshire, appointed a receiver for the Maine Company, and in 1930 the receiver, by order of the court, sold all of the property of the Maine Company in that jurisdiction for $450. The chancellor found that the defendant "failed to reach the $450, proceeds of the receivership, which, so far as this case shows, he might have received by proving a claim therein; and the chancellor, when assessing the damages, gave the plaintiffs credit for that $450. We think that the plaintiffs received all that they were entitled to, if not more, by that act of the chancellor.

It appears from the findings before us that in certain material respects the facts shown by the evidence in the hearing below are wholly different from those shown by the evidence in the former hearing.

The chancellor found that the. Massachusetts Company was a holding company and not an operating company. It owned or controlled five subsidiary public utility companies operating

in New Hampshire, and the value of its stock, either preferred or common, "depended, generally speaking, upon the earnings and financial standing of its subsidiary companies, unless the stock had a sale or other value by reason of its voting or controlling power or something of that nature."

During the years from 1918 down to the time the subsidiary companies went into the hands of the purchasers under the escrow agreement, hereinafter referred to, they were in financial straits and were insolvent; their physical properties were in a dilapidated, worn-out, and obsolete condition; they were not earning enough money for operating expenses and were unable to obtain money for necessary repairs; and they were heavily indebted to the holding company.

In 1920, because of the poor and inadequate service they were rendering to the public, a committee of three managers was appointed by an order of the Public Service Commission of New Hampshire to operate the subsidiary companies in an endeavor to furnish adequate service to the public. At the same time the Commission authorized an increase of rates upon condition that no interest or any part of the principal should be paid on the indebtedness due to the Massachusetts Company from any of the subsidiary companies without the approval of the Commission; that the Massachusetts Company should accept in payment of indebtedness of the subsidiary companies to it the stock of such companies at its par value; that notes held by the Massachusetts Company against such companies should not be transferred without approval of the Commission; and that no dividends should be paid upon any of the stock of such companies. It was further ordered that the increased rates were conditioned upon the filing with the Commission of assurance satisfactory to it by a recognized reliable financial individual, banking house, or monied concern that money was to be advanced to the various subsidiary companies at once and as often and in such sums as might be needed to pay their overdue indebtedness to others than the Massachusetts Company, and to provide them with enough working capital so they could carry on hand enough material and supplies reasonably necessary to care for the ordinary repairs and renewals, and sufficient to pay for their changes and improvements, etc. The committee of managers remained in charge of the properties up

to or about the time the sale was made under the escrow agreement.

The chancellor found that the preferred stock of the Massachusetts Company, with a par value of $100 per share and preferred both as to dividends and assets and with dividends thereon cumulative, was worth approximately $50 per share; that at the time of the consummation of the escrow agreement, the various subsidiary companies were indebted in excess of $440,000, and the purchasers under the agreement were obligated to assume that indebtedness.

The chancellor also found, upon all the evidence in the case, that the 6,690 shares of common stock of the Massachusetts Company, at the time the injunction was granted, were of no value "unless a price could have been or was obtained therefor presumably by reason of its voting power or control in the management of the affairs of the company, as the 6,690 shares were more than a majority of the common stock of said company."

It appears that on March 23, 1923, Frederick L. Houghton entered into a written "Escrow and Option Agreement" (Deft's Ex. A), which took the place of similar agreements executed on September 25, 1922, and January 11, 1923, which had terminated by their own terms, wherein he agreed to sell certain stocks, notes, checks, and other personal property, and also agreed to turn over to the "Buyers" named therein the 6,690 shares of stock. The agreement provided that the buyers, after the delivery to them by the depositary named therein of the stocks, checks, and notes delivered to it, would cause the Massachusetts Company to transfer, convey, and deliver to the Maine Company 200 shares of the Raymond Electric Company and the Pittsfield Light & Power Company, and certain lands, water rights, flowage, and diversion rights and options formerly owned by the Maine Company. After the escrow agreement was consummated in 1924, the Massachusetts Company transferred, conveyed, and delivered the above specified property to the Maine Company.

The chancellor found that John Manley obtained the Raymond Electric Company by foreclosure, and that the Maine Company did not realize any value therefrom. He was unable to find that the real estate, rights, and options had any value.

A Mr. Wheelock testified that the Maine Company received the property transferred to it by the Massachusetts Company in exchange for the common stock of the latter company which it owned. He and a Mr. Pearson had an option on the stock of the Pittsfield Company. They sold the stock, and the Maine Company received about $19,000 for the same.

The chancellor found, solely upon the evidence of Mr. Wheelock, that the Maine Company received not less than $19,000 for the 6,690 shares of common stock of the Massachusetts Company owned by it, "and that the value thereof as shown in this case was $19,000," as of a date, he also found, not later than October 7, 1926.

The chancellor found in finding 26 that "the 6,690 shares of common stock of the Massachusetts Company while the injunction was in force had a value of not less than $19,000, the Maine Corporation having received therefor properties disposed of for not less than $19,000, namely, stock of said Pittsfield Company."

The chancellor also found that but for the injunction, the defendant might have reached the 6,690 shares of stock "for the purpose of obtaining what he could realize in satisfaction of his claim."

The plaintiffs excepted to the several findings as to the value of the 6,690 shares of common stock of the Massachusetts Company on the ground, among others, that they are not supported by the evidence or the other findings. We consider first the finding that the 6,690 shares of stock had a value of not less than $19,000 while the injunction was in force, because the defendant's case must stand on that finding.

In considering this question we do not start with the findings that, at the time the injunction was granted, the value of the stock was more than sufficient to cover the amount of the judgment finally obtained by the defendant, and, if he had not been enjoined, he could have satisfied his judgment by proper proceedings against the stock certificate wherever found, which were in the case at the former hearing before us, but with the findings that, at the time the injunction was granted, the stock was of no value, unless a price could have been obtained for it by reason of its voting power or control in the management of the affairs of the company, and, if the defendant had not been enjoined, he might have reached the shares of stock "for the purpose of obtaining what he could realize in satisfaction of his claim."

■ ■ At the hearing below, the burden was upon the defendant, as we held the last time the case was before us, to establish his damages by proper evidence. In the face of the finding that the stock had no value at the time the injunction was granted unless by reason of its voting power or control, it was necessary for him, in order to make such damages appear, to prove by proper evidence that the stock had a special value by reason of its voting power or control in the management of the affairs of the Massachusetts Company at the time the injunction was granted, what that value was in money, and that he could have collected the same in satisfaction of his judgment, in whole or in part, if the injunction had not been granted.

■ The chancellor did not make an express finding whether or not the stock had a special value by reason of its power to control the affairs of the company, but the fact that it had such a special value is reasonably to be inferred from the finding we are considering, because the chancellor found that, except for such special value, the stock had no value. If the finding that the stock had a value of not less than $19,000 while the injunction was in force is supported by proper evidence, we will presume in support of the decree that the chancellor inferred that such value was by reason of the power of the stock to control the affairs of the company. *Labor* v. *Carpenter*, 102 Vt. 418, 422, 148 Atl. 867. If the finding is not supported by proper evidence, there is no finding that will support the decree.

■ It appears from the finding itself, that the finding that the stock had a value of not less than $19,000 while the injunction was in force, is based upon the fact that the Maine Company received that sum from the sale of the stock of the Pittsfield Company, which, the chancellor found, was of a date not later than October 7, 1926. But the fact that the stock was worth $19,000 on October 7, 1926, is not proper evidence tending to show that it had such a value on December 23, 1921, when the injunction was granted, and while it was in force, unless it appears that during that time the stock had a special value by reason of its voting or controlling power, and that there was a connection between that value and what the Maine Company received for its stock of the Pittsfield Company. No evidence has been called to our attention which tends to show that value and connection. *Jones* v. *Ellis' Estate*, 68 Vt. 544, 548, 35 Atl. 488; *Moffitt* v. *Hereford*, 132 Mo. 513, 34 S. W. 252. In *Jones* v.

*Ellis' Estate,* it was material to show the value of shares of stock of a company purchased by the plaintiff in 1890. It was held that the condition of the assets and liabilities of the company in 1894 did not tend to show the value of the stock in 1890, without anything to connect the condition of the company in 1894 with the state of its affairs in 1890.

█ █ The chancellor found that the method by which the Maine Company finally received $19,000 for its stock of the Massachusetts Company was through the agreement of the Buyers in the escrow agreement to transfer to it the stock of the Pittsfield Company, which it afterwards sold. It is apparent from the provisions of the escrow agreement that the Maine Company could receive anything for its stock only upon the happening of the consummation of the agreement, and the value it would receive upon the happening of that event would depend upon what it realized from the sale of the stock of the Pittsfield Company.

The chancellor found that there was no evidence that either the Maine Company or the Massachusetts Company controlled all of the stocks, checks, and notes required to be delivered to the depositary under the terms of the escrow agreement. An examination of that document shows that they did not have that control.

It appears from the agreement that Mr. Houghton, named therein as the "Seller," represented the Maine and Massachusetts Companies, owners of the stock of the Contoocook Electric Light Company, a company not controlled by the Maine Company or the Massachusetts Company, the Houghton Associates, holders of the common and preferred stock of the Massachusetts Company other than the Maine Company, and various creditors of the Massachusetts Company, among whom were himself and John Manley; that, in order to consummate the agreement, it was necessary that all of the stocks, checks, and notes specified therein should be deposited with the depositary named therein, who should deliver the same to the Buyers if they decided to buy before a certain day, and upon the delivery of certain sums of money by them to the depositary, which were to be used, and were used, for paying for the stock of the Contoocook Company and the indebtedness of the Massachusetts Company specified therein, the evidence of which was deposited with the depositary. In this indebtedness there were notes and claims of

about $100,000 on which Mr. Houghton and Mr. Manley were liable as indorsers, notes held by Mr. Manley, and checks for dividends on the preferred stock of the Massachusetts Company which were owned by Mr. Houghton and other owners of the preferred stock. It appears from the evidence that the purpose of the escrow agreement was to bring about a reorganization of the Massachusetts Company and its subsidiary companies, and thereby improve their financial and physical condition.

The defendant argues that, if by reason of the control of the 6,690 shares of stock, Mr. Houghton and Mr. Manley were able to get themselves relieved of personal liability of over $100,000 and to receive about $24,000 for notes and preferred stock dividends through the assets of the Massachusetts Company, the chancellor was justified in finding that, if the defendant had obtained possession of that stock, his control of that company "would have enabled him to have made a like use of the assets to the comparatively small amount which was due him— he not being a stockholder but a creditor."

There are several misconceptions of fact and law in this argument. It does not appear that Mr. Houghton and Mr. Manley benefited by reason of the voting power and control of the stock owned by the Maine Company in the management of the affairs of the Massachusetts Company, but rather because they were creditors of the latter company. If any one benefited by reason of that voting power and control it was the Maine Company, but it does not appear that that company received the stock of the Pittsfield Company by reason of that power and control. The defendant was a creditor of the Maine Company but not of the Massachusetts Company. If he had acquired the 6,690 shares of stock he would have become a stockholder in the Massachusetts Company. The stock would have given him the control of the affairs of that company, except as that control was limited by the orders of the Public Service Commission of New Hampshire under which its subsidiary companies were being operated at all times material in this case. But even the control of the company would not have enabled him to use its assets to collect his judgment against the Maine Company. Such assets could be used only for paying the debts of the Massachusetts Company, and, so far as it appears from the findings, his control thereof would have been valueless for collecting his judgment

unless he could have obtained for the stock under the escrow agreement what the Maine Company received.

The chancellor states in the findings that the only evidence that the defendant could have obtained for the 6,690 shares of stock what the Maine Company received is that the latter company did in fact receive what it obtained in the manner set forth in the findings. But that fact, standing alone, has no tendency to prove that the defendant could have obtained $19,000 for the stock, as there is no relevancy between that fact alone and the fact to be proven. To give that fact the tendency claimed for it, the burden was on the defendant to make it appear that if he had acquired the stock the escrow agreement would have been consummated and that he would have received the same treatment under its provisions that the Maine Company received. There is nothing in the findings or the evidence tending to establish these essential facts.

It does not appear that the defendant, himself, could have negotiated and completed the escrow agreement if he had acquired the stock. To do that, it was necessary for the Seller to have the control of the stocks, notes, and checks specified in the agreement. The chancellor found that there was no evidence that the defendant could have secured the control of those stocks, notes, and checks if he had possessed the 6,690 shares of stock.

Since the finding that the 6,690 shares of stock had a value of not less than $19,000 while the injunction was in force, is without supporting evidence, the finding of damages falls with it, and the case must be reversed. It is not necessary to consider the other exceptions briefed by the plaintiffs.

*Decree reversed, and cause remanded.*